UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____

UNITED STATES
    v.
DANIEL SAAD,
     Defendant.
_____

Cr. No. 16-035-JJM-PAS

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., Chief United States District Judge

  Daniel Saad has petitioned this Court under 28 U.S.C. § 2255 to vacate, set aside, or correct his judgment of conviction, entered after he was found guilty of two counts of wire fraud, one count of use of fire to commit wire fraud, and one count of arson of a building.  He now claims that the Court should vacate his conviction because he is actually innocent of three of the charges, he received ineffective assistance of counsel, and law enforcement engaged in misconduct.  The Court has determined that no hearing is necessary.  The Court finds that Mr. Saad's Motion to Vacate (ECF No. 92) lacks merit and thus DENIES his petition.

## FACTS

  A federal grand jury sitting in the District of Rhode Island indicted Mr. Saad on two counts of wire fraud (Counts 1-2), one count of using fire to commit wire fraud (Count 3), and one count of arson of a building involving interstate commerce (Count 4).  Mr. Saad was arrested and arraigned two days later.  The charges, and Mr. Saad's

arrest, stemmed from a fire at Snow's Clam Box, a restaurant Mr. Saad owned in Glocester, RI, on November 30, 2014.

Subsequently, a jury convicted Mr. Saad on all four charges. The Court sentenced him to three sixty–month terms of imprisonment for Counts 1, 2, and 4, to run concurrently, a consecutive 120–month term of imprisonment on Count 3, and one year of supervised release as to each Count, to run concurrently. Mr. Saad appealed the judgment, which the First Circuit affirmed. He did not seek further review.

Mr. Saad timely filed this Motion to Vacate.

## LAW

### A.    Section 2255

Section 2255 provides for post-conviction relief only if the court sentenced a petitioner in violation of the Constitution or lacked jurisdiction to impose the sentence, if the sentence exceeded the statutory maximum, or if the sentence is otherwise subject to collateral attack. *United States v. Addonizio*, 422 U.S. 178, 185 (1979); *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). In trying to collaterally attack his sentence, the petitioner bears the burden of proving "exceptional circumstances" that warrant redress under § 2255. *See Hill v. United States*, 368 U.S. 424, 428 (1962); *Mack v. United States*, 635 F.2d 20, 26-27 (1st Cir. 1980). For example, an error of law must constitute a "fundamental defect which inherently results in a complete miscarriage of justice." *Hill v. United States*, 368 U.S. at 428; *accord David*, 134 F.3d at 474.

### B.      Procedural Default

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent' of the crimes for which he was convicted."  *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted); *see also Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  "Cause" consists of "some objective factor external to the defense[.]"  *Carrier*, 477 U.S. at 488; *see also Coleman*, 501 U.S. at 753 (noting that, in *Carrier*, "[w]e explained clearly that 'cause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him").  To demonstrate prejudice, the "habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  *Carrier*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (alteration in original); *see also Derman v. United States*, 298 F.3d 34, 45 (1st Cir. 2002) ("The showing of prejudice needed to cure a procedural default generally requires a habeas petitioner to demonstrate that there is a reasonable probability that the result of the trial would have been different absent the error.  The question is not whether the petitioner, *qua* defendant, would more likely have received a different verdict had the error not occurred, but whether he received a fair trial, understood as a trial worthy of confidence, notwithstanding the bevue.") (internal citations and quotation marks

omitted).  The defendant must show both cause and prejudice.  *Carrier*, 477 U.S. at 494; *Derman*, 298 F.3d at 45 (noting that petitioner bears burden of demonstrating both cause and prejudice).

The "actual innocence" standard established by the Supreme Court in *Carrier* "requires the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  To establish the requisite probability, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id.* at 327.  A credible claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial").  *Id.* at 324. The standard is "demanding and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley*, 523 U.S. at 623 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).  "In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges."  *Id.* at 624.

C.  *Strickland*

The Sixth Amendment guarantees defendants the right to effective assistance of counsel.  *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993) (citing *Strickland*

*v. Washington*, 466 U.S. 668, 687 (1984)).  That said, "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." *United States v. Natanel*, 938 F.2d 302, 309-10 (1st Cir. 1991).

A defendant who claims that he was deprived of his Sixth Amendment right to effective assistance of counsel must prove:

(1)   that his counsel's performance fell below an objective standard of reasonableness; and

(2)   a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Strickland*, 466 U.S. at 687-88; *United States v. Manon*, 608 F.3d 126, 131 (1st Cir. 2010).  In assessing the adequacy of counsel's performance, a defendant "'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' and the court then determines whether, in the particular context, the identified conduct or inaction was 'outside the wide range of professionally competent assistance.'"  *Manon*, 608 F.3d at 131 (quoting *Strickland*, 466 U.S. at 690).  As for the second prong, or the prejudice requirement under *Strickland*, a "reasonable probability is one sufficient to undermine confidence in the outcome.  In making the prejudice assessment, [the court] focus[es] on the fundamental fairness of the proceeding." *Id.* (internal citation omitted).  Unless the petitioner makes both showings, the court cannot say that the conviction resulted from a "breakdown in the adversary process that renders the result unreliable."

*Strickland*, 466 U.S. at 687; *see also Reyes-Vejerano v. United States*, 117 F. Supp. 2d 103, 106 (D. P.R. 2000) ("The petitioner has the burden of proving both prongs of this test, and the burden is a heavy one."). In sum, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

*Strickland* instructs, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

The same principles apply in the context of guilty pleas. *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985). The Supreme Court held that "the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Id.* at 58; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 n.12 (2010) ("In

*Hill*, the Court recognized—for the first time—that *Strickland* applies to advice respecting a guilty plea."). The first prong of the *Strickland* test is nothing more than a restatement of the standard of attorney competence described above. *Hill v. Lockhart*, 474 U.S. at 58. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Id.* at 59. "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (citing *Missouri v Frye*, 566 U.S. 134, 148 (2012)); *see also Frye*, 566 U.S. at 147 ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time."). The Court reiterated that, as stated in *Strickland*, "these predictions of the outcome at a possible trial, where necessary, should be made objectively …." *Hill v. Lockhart*, 474 U.S. at 59-60.

## ANALYSIS

As noted above, Mr. Saad filed the Motion to Vacate (ECF No. 92), and accompanying exhibits (ECF No. 92-1), and the Government then filed a response in opposition (ECF No. 98), also with accompanying exhibits (ECF Nos. 98-1–98-3).[1] To date, Mr. Saad has not filed a reply to the Government's opposition.

Mr. Saad alleges that he is actually innocent of the three wire fraud counts, ECF No. 92 at 5-9 (Ground One); that he received ineffective assistance of counsel,

---

[1] The Government's exhibits include the Affidavit of Mr. Saad's trial counsel and attachments. ECF No. 98-1.

*id.* at 9-64 (Grounds Two–Six); and that law enforcement officials committed misconduct, *id.* at 64-65 (Ground Seven).[2]

A. Actual Innocence

Initially, Mr. Saad argues that he is actually innocent of the two wire fraud counts and, by extension, the use of fire to commit wire fraud count. ECF No. 92 at 5. He also faults counsel for failing to discover this "fact," move to dismiss the counts, or rebut the Government's evidence. *Id.* at 7, 9. According to Mr. Saad:

> The Government's theory of wire fraud consisted solely of its contention that the Petitioner contacted his insurance agent (Lorraine Lavigne) by telephone in order to initiate an insurance claim. In turn, the Government alleged, Mrs. Lavigne generated an email to XS Brokers and then XS Brokers sent an email to its "Adjuster". [sic]
>
> However, what the Government neglected to inform the jury and, more significantly, what defense counsel failed to discover and make use of, is the obvious and incontrovertible fact that the Petitioner did not contact his insurance company (1) of his own volition or (2) in order to make a claim. Rather, the information available to the Government and defense counsel demonstrates that the Petitioner made that call for one simple reason: Rhode Island Deputy Fire Marshal, Paul Manning (Deputy Manning) [told him to] do so.

*Id.* at 7. Therefore, Mr. Saad maintains, he "did not act maliciously or in bad faith. He simply followed the instructions of Deputy Manning." *Id.* at 8. Further, "[t]he record is barren of even a scintilla of evidence that the Petitioner took any further action to induce either Oxford Insurance or XS brokers to process or pay any monies on any claims for a good reason: The petitioner took no such actions." *Id.*

---

[2] Page numbers refer to the pagination generated by the Court's Electronic Filing System.

Mr. Saad's claim fails for three reasons.  First, to the extent he intends to use actual innocence—as opposed to cause and prejudice—to overcome his failure to raise this argument on direct appeal, he has not met the standard.  As noted above, an actual innocence claim requires a showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.   The petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.  "Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329.  Mr. Saad has provided no new evidence that was not, or could not have been, presented at trial; therefore, he cannot make the requisite showing.  *See Schlup*, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.").  Moreover, Mr. Saad's argument goes to legal, not factual, innocence. *See Bousley*, 523 U.S. at 623 (requiring showing of factual innocence, "not mere legal insufficiency"); *see also Barreto-Barreto v. United States*, 551 F.3d 95, 102 (1ˢᵗ Cir. 2008) ("The petitioners raise a purely legal argument concerning an issue of statutory interpretation.  The petitioners do not present any new evidence to show

their 'factual innocence.'  They have failed, therefore, to present a colorable claim of actual innocence.").

Second, to the extent Mr. Saad intends his actual innocence claim to be considered as a freestanding claim, not as a gateway to having a procedurally defaulted claim considered, *see McQuiggan v. Perkins*, 569 U.S. 383, 386 (2013); *Schlup*, 513 U.S. at 315, that argument also fails. "[T]enable actual-innocence gateway pleas are rare[.]" *McQuiggan*, 569 U.S. at 386; *see also House*, 547 U.S. at 538 (emphasizing that the *Schlup* standard is "demanding" and seldom met).  And the standard for a gateway actual innocence claim "carr[ies] less of a burden" than a freestanding claim.  *Schlup*, 513 U.S. at 316.  Because Mr. Saad has failed to meet the *Schlup* standard, he obviously cannot meet a higher standard for a freestanding actual innocence claim.

Third, to the extent Mr. Saad contends that his defense counsel ("Counsel") provided ineffective assistance with respect to this claim, Counsel has persuasively countered Mr. Saad's allegations:

> I am aware of Saad's allegation that he contacted his insurance company only because Rhode Island Deputy Fire Marshal Paul Manning told him to do so.  Saad asserts this information establishes that he himself did nothing to induce the insurance company to pay off his claim concerning the Clam Box, and that I therefore should have presented Manning's testimony on that score at trial.  In my view Manning did not "order" Saad to contact his insurance company; the comment was more in the nature of a suggestion that Saad could follow if he chose to do so.  I was also aware that the government would be introducing evidence that Saad's insurance company had paid on an arson claim he had made in 2012, which would have demonstrated to the jury that Saad knew the importance of filing an insurance claim, as well as how to go about doing so, years before the Snow's Clam Box fire occurred.  Saad himself testified about his conversation with Manning.  I did move for judgment

10

of acquittal based on insufficiency of the evidence but that motion as well as my motion for a new trial on the same grounds were denied. Based on my familiarity with the elements of 18 U.S.C. § 1343 as well as the government's copious circumstantial evidence of intent, I do not believe that Manning's additional testimony on the same point, if presented, would have negated the government's proof of the intent element of § 1343.

ECF No. 98-1 at 6-7 ¶ 11 (internal citation omitted).  Mr. Saad has presented nothing to rebut Counsel's Affidavit beyond his own conclusory allegations, which the Court is not bound to accept.  *See United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993).  Counsel's actions and strategic choices fall within the "wide range of reasonable professional assistance" and "sound trial strategy."  *Jewett v. Brady*, 634 F.3d 67, 75 (1st Cir. 2011); *see also Strickland*, 466 U.S. at 689.  Based on the foregoing, the Court rejects Mr. Saad's first ground for relief.[3]

B.  Ineffective Assistance of Counsel

Next, Mr. Saad presents a plethora of complaints that Counsel provided ineffective assistance throughout the proceedings.  These include Counsel's alleged conflict of interest; failure to discover and utilize the narrative of Officer Donald J. Sousa; failure to move to suppress the warrant to search the premises; failure to conduct reasonable investigations, interview witnesses, and adequately advise Mr. Saad regarding the consequences of testifying and the impact of the testimony of Leah

---

[3]  With respect to *Strickland*'s performance and prejudice prongs, as noted above, "a reviewing court need not address both requirements if the evidence as to either is lacking." *Sleeper v. Spencer*, 510 F.3d 32, 39 (1st Cir. 2007).  Here, as elsewhere in this Memorandum and Order, the Court discusses only the performance requirement.

Saad; and advice to reject the Government's plea offer and/or failure to pursue an *Alford*[4] plea.  The Court addresses each of Mr. Saad's allegations in turn.

    1.  Conflict of interest

Mr. Saad asserts that his Sixth Amendment right to the effective assistance of counsel was violated when Counsel provided legal advice to a Government witness, Justin Moseley, while Mr. Moseley was under subpoena and testifying, in an effort to conceal an ethical violation—in essence, suggesting testimony which contradicted Mr. Moseley's prior testimony—which occurred during a meeting between Mr. Saad, Mr. Moseley, and Counsel at the fire scene.  ECF No. 92 at 9-10.  Counsel allegedly compounded the conflict by failing to alert the Court to Mr. Moseley's testimonial vacillations and took steps to conceal them.  *Id.* at 18.

"In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see also Strickland*, 466 U.S. at 692 (quoting *Cuyler*); *Reyes-Verano*, 117 F. Supp. 2d at 109 ("To establish a conflict of interest, the defendant must show that (1) there was a plausible alternative defense strategy that his attorney could have pursued and (2) this alternative tactic was 'inherently in conflict with or not pursued due to the attorney's other loyalties or interests." (quoting *Familia-Consoro v. United States*, 160 F.3d 761, 764 (1st Cir. 1998)).  The possibility of conflict is not enough.  *Cuyler*, 446 U.S. at 350; *Reyes-Verano*, 117 F. Supp. 2d at 109 ("A merely theoretical or

---

[4] *North Carolina v. Alford*, 400 U.S. 25 (1970).

speculative conflict of interest will not be sufficient to demonstrate a Sixth Amendment violation."). Mr. Saad cannot meet this standard.

Counsel effectively refutes all of Mr. Saad's allegations. The Court quotes at length from Counsel's Affidavit because it provides detail and context for Mr. Saad's claim.

> 14. As part of my defense investigation, I reviewed a transcript of Justin Moseley's testimony before the grand jury as well as a transcript of Justin Moseley's recorded interview with the Rhode Island State Fire Marshal's office. I knew Moseley was going to be a prosecution witness and I never contemplated at any time providing him with legal representation. I met with Moseley at my office well before the start of trial.
>
> 15. I interviewed Mr. Moseley before trial in his capacity as a prosecution witness and also met with him and Saad on January 15, 2017, at the site of Snow's Clam Box. During those meetings, I spoke with Moseley about his recollections of his entry into the building after the fire, and also spoke with him about his use of a gas-powered generator. While at Snow's Clam Box, I asked Moseley to show me those areas of the restaurant where he reportedly worked with the generator. I never stated or implied to Moseley that he should change his testimony concerning where the generator had been located or concerning the route Moseley took to remove it from the building.
>
> 16. On the evening after Moseley began testifying for the prosecution, Saad called me and asked me if Moseley could review the statements he had made before trial. Saad informed me that, according to Moseley, the prosecutor had never shown him his statements, and I therefore agreed to supply them to him. I told Saad that he should not accompany Moseley when Moseley came to my office to review the statements because Saad's participation in Moseley's review of the documents could appear improper.
>
> 17. Moseley arrived at my office at about 7:30 a.m. the morning after I spoke with Saad. Accompanied by [my associate],[5] I provided Moseley with copies of his statements and then left the room. I never reviewed Moseley's statements with him. Moseley never asked me for

---

[5] The associate is an attorney with Counsel's office and assisted Counsel with his preparation for Mr. Saad's trial. ECF No. 98-1 at 4 ¶ 6.

legal advice and I never gave him any.  We never discussed his retention of me as his attorney in any fashion.  When Moseley was finished reviewing his statements I exchanged pleasantries with him before he left, but had nothing in the way of a substantive conversation with him.

18.    I heard Moseley testify in court on January 20, 2017, after he had the chance to review his prior statements.  When the prosecutor asked Moseley during the trial whether "yesterday after you had testified here, did you review a transcript that you had of an interview you had previously engaged in," I understood the focus of the prosecutor's question to be the night of January 19, 2017, which was the night *before* Moseley came to my office to review his prior statements.  I therefore believe that, in context, Moseley's negative response to the prosecutor's question was truthful.

19.    As previously noted, I never suggested to Moseley at any point that he should testify about different locations of the gas-powered generator he used at Snow's Clam Box.  The first time I heard Moseley state that he moved the generator was during the trial.  Moseley never showed me any handwritten notes at any point, and when I later heard his testimony concerning such notes, I was skeptical they existed.  That is the meaning of the text message I sent to Saad that Saad has reproduced in his § 2255 petition at p. 31.

ECF No. 98-1 at 9-11 ¶¶ 14-19 (internal citations omitted).

Mr. Saad also claims that the alleged conflict of interest prevented Counsel from objecting when the prosecutor made improper statements during closing arguments, allowing the prosecutor to "paint Moseley as a liar who planned (with the Petitioner) to present false testimony scripted to innocently account for gasoline in the building."  ECF No. 92 at 26; *see also id.* at 27 (quoting prosecutor's statement regarding Mr. Moseley's testimony: "have you ever seen a more unmitigated liar in your life than Justin Moseley who comes before you on day one and tells you this elaborate story?").

Counsel explains his decision not to object as follows:

> During the prosecutor's closing argument, he accused Saad and Moseley of lying.  Because both Saad and Moseley had made a number of inconsistent statements before and during trial, I considered the prosecutor's characterization of their testimony to be adequately grounded in the factual record.  As a strategic matter, I do not like to interrupt an opposing party's closing argument unless counsel's statements are particularly egregious because doing so only further calls the jury's attention to them.  In this case, because the prosecutor's remarks had an evidentiary basis, I did not believe at the time that they were "egregious" enough to warrant interrupting the argument with an objection, and I therefore made a tactical decision not to do so.

ECF No. 98-1 at 12-13 ¶ 26.  Clearly Counsel made a strategic choice, which the Court will not second-guess.  *See Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) ("Under the first prong of *Strickland*, there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of reasonable professional assistance,' and courts should avoid second-guessing counsel's performance with the use of hindsight." (quoting *Strickland*, 466 U.S. at 689); *Sleeper*, 510 F.3d at 38 ("Counsel has 'wide latitude in deciding how best to represent a client . . .'" (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

Moreover, Mr. Saad raised the issue of the prosecutor's commentary on the witness's testimony on direct appeal.  *See United States v. Saad*, 888 F.3d 561, 569 (1st Cir. 2018).  The First Circuit found that Mr. Saad had not shown "a reasonable likelihood that the result would have been different without the challenged comments."  *Id.* at 570-71 (internal quotation marks omitted).  Because the appellate court found that Mr. Saad had not demonstrated prejudicial error, Counsel cannot be faulted for declining to object to the comments.  *See Lafler*, 566 U.S. at 167 ("Because the objection upon which his ineffective-assistance-of-counsel claim was premised

was meritless, [the petitioner] could not demonstrate an error entitling him to relief."); *Dure v. United States*, 127 F. Supp. 2d 276, 280 (D.R.I. 2001) (noting that, because there was no merit to petitioner's claims of error, counsel could not be deemed ineffective for declining to pursue futile arguments (citing *Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999)).

As before, Mr. Saad has provided nothing beyond his own allegations to back up his claims against Counsel. *See McGill*, 1 F.3d at 225.   He has not attempted to rebut Counsel's Affidavit with evidence or affidavits of his own.   Even assuming Counsel's interpretation of the prosecutor's question to Mr. Moseley regarding reviewing transcripts was incorrect, a simple mistake does not amount to ineffective assistance. *See Natanel*, 938 F.2d at 309-10; *see also Reyes-Vejerano*, 117 F. Supp. 2d at 106 ("An attorney's performance is deficient if it is so inferior as to be objectively unreasonable." (internal quotation marks omitted)).   Clearly that is not the case here.

"[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350.   Mr. Saad has not demonstrated that Counsel actively represented conflicting interests and, therefore, the Court rejects Mr. Saad's second ground for relief.[6]

2.   Failure to discover or use Officer Sousa's narrative

---

[6]   Because Mr. Saad has not demonstrated the existence of an actual conflict of interest, the court need not address whether he was adversely affected. *See Cuyler*, 446 U.S. at 350.

16

Mr. Saad challenges Counsel's alleged failure to discover or make use of an "exculpatory" narrative written by Officer Sousa, which contradicted the testimony of an eyewitness to the fire, Tracey Smith. ECF No. 92 at 35. According to Mr. Saad, "Ms. Smith's account remained relatively consistent during both her December 1st and December 4th interviews . . . ," ECF No. 92 at 42, but those interviews differed greatly from the one she gave to Officer Sousa on the morning of the fire, *see id.*

The basic premise of Mr. Saad's argument is faulty. Counsel states that he made a formal request for discovery on April 2, 2016, and "thereafter received a series of discovery productions from the government." ECF No. 98-1 at 3 ¶ 6. Those materials included Officer Sousa's report.[7] *Id.* at 4 ¶ 7. Thus, Counsel did not fail to "discover" the report.

As for Counsel's alleged failure to "make use of" Officer Sousa's narrative, ECF No. 92 at 35, Counsel states:

> Because of my familiarity with all of the discovery materials the government had supplied, I was aware before trial of the factual discrepancies between the statements in Officer Sousa's report of an interview with prosecution witness Tracey Smith and the recorded statements that Smith herself made to investigators later in the arson investigation. I originally intended to present Officer Sousa as a defense witness for purposes of highlighting these discrepancies for the jury, and therefore subpoenaed him for trial. During my cross-examination of Tracey Smith, however, I was able to point out to the jury all of the relevant discrepancies in Smith's testimony, and I therefore concluded as a matter of trial strategy there was no longer any need to present Officer Sousa's testimony on those points during the defendant's case-in-chief.

ECF No. 98-1 at 6 ¶ 9 (internal citation omitted).

---

[7] The Government states that it produced Officer Sousa's report to the defense on April 13, 2006. ECF No. 98 at 10.

"[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. "The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony." *Lema*, 987 F.2d at 54; *see also Phoenix v. Matesanz*, 233 F.3d 77, 82 (1st Cir. 2000) ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  In short, strategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable*.") (internal citations and quotation marks omitted).  It is clear that Counsel chose to address the discrepancies in Ms. Smith's accounts through cross examination rather than calling Officer Sousa to testify.  The Court cannot fault Counsel's strategic decision in this regard.  *See Reyes-Vejerano*, 117 F. Supp. 2d at 108 ("A court's determination of whether an attorney's performance constituted ineffective assistance does not require it to second-guess which of two viable strategies would have been more likely to succeed").

### 3.  Failure to move to suppress search warrant for premises

Mr. Saad alleges that Counsel provided ineffective assistance when he failed to move to suppress the search warrant issued by the state court for the Snow's Clam Box premises.  ECF No. 92 at 46.  According to Mr. Saad, the "probable cause affidavit contains materially false and/or misleading information, and materially relevant information was withheld from the judicial officer signing the warrant." *Id.* Whether

taken together or considered separately, the "cherry-picked" information "required" Counsel to file a motion to suppress. *Id.* at 51.

Counsel states:

As part of my pretrial preparation in this case, I reviewed the search warrant issued on December 4, 2014, that authorized the search of the restaurant's premises, as well as the warrant's supporting affidavit. I was satisfied that the affidavit established probable cause for the issuance of the search warrant, and therefore in my judgment filing a motion to suppress was unwarranted, which is why I did not do so.

ECF No. 98-1 at 3 ¶ 5.

Again, Counsel is presumed to have made the decision not to file a motion to suppress in the exercise of reasonable professional judgment. *See Phoenix*, 233 F.3d at 82; *Reyes-Vejerano*, 117 F. Supp. 2d at 108 ("A court does not evaluate an attorney's conduct with the benefit of hindsight, but from the attorney's perspective at the time of the trial." (citing *Strickland*, 466 U.S. at 689)).

> 4. Failure to conduct reasonable investigations, interview witnesses, and properly advise Mr. Saad regarding testimony

Mr. Saad alleges that that Counsel was not adequately prepared effectively defend him at trial. ECF No. 92 at 52. Mr. Saad's laundry list of complaints against Counsel include Counsel's supposed failures to: conduct a reasonable investigation into the Government's circumstantial case against Mr. Saad and possible defenses thereto, including interviewing witnesses suggested and provided by Mr. Saad; adequately advise Mr. Saad of the consequences of testifying in his own defense in light of his multiple false alibis; and adequately advise Mr. Saad of the likely impact that Leah Saad's testimony that he asked her to support one of his false alibis would

19

have on the jury. *Id.* Mr. Saad's allegations are simply that, allegations. *See McGill*, 11 F.3d at 225. Moreover, Counsel has addressed them thoroughly.

> For example, with respect to interviewing witnesses, Counsel states:

> I understand that Saad has complained that I did not interview and/or call various witnesses for trial. I did not pursue these witnesses for trial because I made an informed strategic decision at the time that they would not have buttressed the defense's position in any way, and/or that I had more effective means of conveying the same information to the jury[.]

ECF No. 98-1 at 8 ¶ 13. Counsel then proceeds to discuss specific witnesses Mr. Saad proposed and why Counsel chose not to call them to testify. *See id.* ¶ 13(a) & (b).

As noted above, the decision whether to call a specific witness "is almost always strategic . . . ." *Phoenix*, 233 F.3d at 83 (quoting *Lema*, 987 F.2d at 54). Further, "[t]he decision to *interview* potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." *Lema*, 987 F.2d at 55; *see also Sleeper*, 510 F.3d at 38 (noting counsel's "wide latitude" in determining how best to represent his client). A strategic choice that the witnesses would not be helpful, or that there were "more effective means of conveying the same information to the jury," ECF No. 98-1 at 8 ¶ 13, is a tactical decision which the Court presumes was made in the exercise of reasonable professional judgment, *see Strickland*, 466 U.S. at 689; *see also* ECF No. 98-1 at 8 ¶ 13.(b) ("Given the state of the prosecution's evidence, I believed I could undermine the persuasiveness of the prosecution's theory of the case without presenting a witness whose testimony would have contributed nothing to my efforts."). Mr. Saad has not overcome the presumption that Counsel's

20

actions "might be considered sound trial strategy," *Strickland*, 466 U.S. at 689, and his suggestions to the contrary, *see, e.g.*, ECF No. 92 at 60 ("There is a very high likelihood that [the witness's] testimony would have impacted the jury's verdict . . ."), amount to pure speculation.

Mr. Saad also assails Counsel's failure to interview possible witnesses "who would have placed the varying (but nevertheless stable) financial condition of Petitioner's collective assets and liabilities into perspective against the backdrop of the Government's contention that the motive for the alleged arson was to wipe away debt." *Id.* at 53. These "potential defense witnesses," *id.*, included vendors, employees, and bank officials. *Id.* at 53-56.

Counsel responds:

(c)     Saad and I had numerous discussions about the financial situation of his restaurants.   Saad never denied that his financial situation was precarious.   When I asked him for help in countering the financial information at trial, his typical response was to the effect that, "they are what they are.   They're a mess."   I was nevertheless able to exclude some of the financial information through pretrial motions.

(d)     Because most of Saad's financial records were introduced into evidence by the government, my strategy at trial was to point out to the jury via cross-examination and during closing argument how Saad's companies were in the midst of a financial upswing and improving their fiscal positions at the time of the fire, and therefore that he had no motive to burn down Snow's Clam Box.   Based on my extensive trial experience, I thought this was the most effective way to proceed because I did not want to bore the jury with prolonged financial testimony.   I used Saad's tax returns to show that he was actually making money at the time of the fire.

ECF No. 98-1 at 8-9 ¶ 13 (c) & (d) (internal citations omitted).

The observations above regarding strategic decisions to call—or not to call—witnesses are equally applicable here.  *See Lema*, 987 F.2d at 54 ("Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence."); *see also Natanel*, 938 F.2d at 310 ("That counsel's stratagem may, in retrospect, have proved unsuccessful, or even unwise, is not the issue.").  Moreover, Mr. Saad again speculates as to the impact these proposed witnesses may have had on the outcome. *See, e.g.*, ECF No. 92 at 54 (noting "high probability" that, had Counsel called certain witnesses, "the jury would have come to a different conclusion . . .").

Mr. Saad also criticizes Counsel's handling of the scientific evidence regarding the cause of the fire:

> In essence[], Counsel waited until the last minute to familiarize himself with the scientific component of the Government's case, and then was unable to retain a competent expert who was actually available to testify at trial and offer an opinion as to (a) whether he agreed or disagreed with the manner in which the investigation was conducted, and (b) whether or not he agreed with the Government's expert's contention that the fire was not accidental, but was started by an ignitable fluid.

Id. at 57.  As the Government notes, Mr. Saad is simply wrong.  ECF No. 98 at 16.

Counsel first states that, as part of his initial discovery request, he obtained and reviewed the report prepared by Special Agent James Hartman of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, in which he set forth the results of his investigation and his conclusions regarding the cause and origin of the fire at

Snow's Clam Box.  ECF No. 98-1 at 3-4 ¶¶ 6-7.  Counsel also received and reviewed other reports related to the arson investigation.  *Id.* at 4 ¶ 7.  Subsequently, Counsel affirms:

> I took several actions to oppose and/or counteract the effect of the government's expert testimony concerning the cause and origin of the fire:

> (a) I filed a motion *in limine* and a motion for a Daubert[8] hearing, both of which were aimed at excluding the government's expert's testimony.  The district court denied both of these motions.

> (b) I sought scientific expertise to help me prepare to counter the government's arson experts at trial.  I first contacted Unified Investigations, a firm I was referred to by a former Providence deputy fire chief.  In November 2016, when Unified Investigations declined the case due to a conflict of interests, I contacted John Lentini at Scientific Fire Analysis, LLC.  When Lentini told me he was not available, he referred me to Christopher Wood of Fire Link, LLC.  I provided Wood with a variety of relevant materials to review.  Upon reviewing the materials, Wood informed me that he did not believe I would find the content of his testimony to be useful to Saad's defense case; however, he felt that he could help me prepare to cross-examine the government's arson experts.

> (c) I retained Wood and Fire Link in late November of 2016.  Both [my associate][9] and I worked closely with Wood in order to prepare our cross-examinations of the government's witnesses; among other things, he provided me with documents that helped me prepare for the cross-examinations.  [My associate] worked closely with Wood in this regard as well.  Because the government had the burden of proof at trial, and because, in Wood's own view, his testimony would have been detrimental to the defense's position, in my professional judgment I made a reasonable strategic decision at the time to use him solely to prepare my cross-examinations of the prosecution's witnesses.

---

8  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

9  *See* n.5.

(d) As I informed Wood after the jury returned its verdict, his help was instrumental in allowing me to adequately cross-examine the state fire marshal and Special Agent Hartman.

*Id.* at 5-6 ¶ 8 (internal citations omitted).

It is clear from the foregoing that Counsel made a reasonable investigation with respect to the cause of the fire. *See Reyes-Vejerano*, 117 F. Supp. 2d at 107 ("Counsel for a criminal defendant must make a reasonable investigation in the preparation of his case. Counsel's assistance will be found to be ineffective if he has performed little or no investigation in the case.") (internal citation omitted). The record belies Mr. Saad's assertions to the contrary. *See id.* at 108; *see also Natanel*, 938 F.2d at 310 ("given adequate investigation, a lawyer's strategic choices . . . relevant to plausible options are virtually unchallengeable' on sixth amendment grounds" (quoting *Strickland*, 466 U.S. at 690)) (alteration in original). They are, therefore, therefore, rejected.

In this section, Mr. Saad also complains about Counsel's handling of the removal of the pellet stove from the premises. ECF No, 92 at 57-58. Mr. Saad claims that Counsel: "unreasonably failed to ascertain precisely when the pellet stove was seized, or under what authority and upon what probable cause," *id.* at 58; "never moved to suppress any of the evidence or test results originating from the unlawful seizure and examination of the pellet stove," *id.*; and therefore failed to prevent the jury from "consider[ing] evidence that was unlawfully seized without a warrant . . . ," *id.* Mr. Saad's argument suffers from a fatal flaw: the pellet stove was not unlawfully seized without a warrant.

24

Although when he spoke with the Government regarding the Motion on October 25, 2019, Counsel "could not recall having reviewed a second search warrant authorizing the seizure of a pellet stove." ECF No. 98-1 at 3 ¶ 5. However, according to Counsel, "I now do have a recollection of reviewing the affidavit supporting the warrant for the pellet stove, and I determined that the affidavit supporting that warrant established the requisite probable cause." *Id.* Therefore, there was no failure to ascertain "when . . . under what authority and upon what probable cause," ECF No. 92 at 58, the pellet stove was removed. Nor was there a basis on which to move to suppress evidence or test results from the lawfully seized pellet stove or to prevent the jury from considering that evidence. *See Lafler*, 566 U.S. at 167; *Dure*, 127 F. Supp. 2d at 280.

Next, Mr. Saad argues that Counsel's failure to advise him adequately of the consequences of testifying in his own defense in light of his "multiple false alibis," ECF No. 92 at 52, as well as of "the further negative impact that the expected testimony of Leah Saad . . . would have upon Petitioner's credibility in general," *id.* at 53, was ineffective. According to Mr. Saad, Counsel "unreasonably down played the significance of the fact that the Petitioner had not been truthful with investigators until after his cell phone records were obtained," *id.* at 61, and "convinced him that all that was necessary was to explain those variations to the jury," *id.* at 53. These failures "were objectively unreasonable and amounted to an unconstitutional abandonment of the Petitioner and a total violation of his Sixth Amendment right to the effective assistance of counsel." *Id.* at 61.

Mr. Saad did indeed provide the police with multiple alibis.  He initially "told investigators at the scene that he was home sleeping when he received the first call alerting him to the fire . . . ."  *Id.* at 53.  When the Government put the defense on notice that it intended to produce evidence from Mr. Saad's cell phone provider which placed him within two miles of the premises when he claimed to be home sleeping and within 1500 feet of Snow's Clam Box when the fire alarm was triggered, Mr. Saad claimed that he was with his estranged wife, Leah Saad, in the area.  *Id.*  He asked her to corroborate his story and tell investigators that she was with him in the area, "and thus could verify that he was not at Snow's Clam Box at the time of the fire . . . ."  *Id.*  Mr. Saad's last attempt to explain his whereabouts at the time of the fire was that he was at a lake near the restaurant and was suicidal.  ECF No. 92 at 53; *see also Saad*, 888 F.3d at 567.

Counsel counters Mr. Saad's allegations by first stating that:

> I frequently consulted with Saad during my pretrial preparation.  I met with him and discussed with him the witnesses the government was likely to call and what their testimony would probably involve.  I also discussed with Saad the challenges his prior conflicting, false statements to law enforcement officials presented for his defense, and reviewed those challenges with him.

ECF No. 98-1 at 11 ¶ 20.  In addition,

> In preparing for trial, I reviewed the transcript of Leah Saad's grand jury testimony as well as various reports documenting investigators' interviews with her.  These materials included a transcript of the Rhode Island State Fire Marshal's office's recorded interview with Ms. Saad.  As an experienced criminal defense attorney, I was well aware of the detrimental impact that Ms. Saad's testimony would have on the defense case.  I discussed Ms. Saad's testimony with Saad before trial, a discussion which included the fact that Ms. Saad might be given immunity as well as how the jury would perceive her testimony in view

26

of Saad's own statements.  I made Saad aware of the detrimental impact
her testimony would have on his case.

*Id.* at 7 ¶ 12.

"It is all too tempting for a defendant to second-guess counsel's assistance after

conviction or adverse sentence, and it is all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission

of counsel was unreasonable." *Strickland*, 466 U.S. at 689.  It appears that, in

hindsight, Mr. Saad wishes he had made a different choice regarding testifying and

seeks to blame Counsel.  Even assuming Counsel did not advise Mr. Saad as strongly

as Mr. Saad would have liked against testifying, however, that does not render

Counsel's assistance ineffective.  *See Sleeper*, 510 F.3d at 38 ("[T]he Sixth

Amendment guarantees reasonable competence, not perfect advocacy judged with the

benefit of hindsight." (quoting *Yarborough*, 540 U.S. at 8)).

> 5. Failure to advise Mr. Saad to accept the Government's plea
>    offer or pursue *Alford* plea

Mr. Saad's final claim of ineffective assistance is that Counsel advised him to

reject the Government's plea offer to a single count of wire fraud without (1)

conducting a reasonable investigation into the Government's case and possible

defenses, including interviewing witnesses provided by Mr. Saad; (2) without

exploring the possibility of entering an *Alford* plea; (3) without adequately advising

Mr. Saad of the consequences of testifying in his own defense in light of the multiple

false alibis he offered; and/or (4) without adequately advising Mr. Saad of the impact

that the testimony of Leah Saad, his estranged wife, would have on the jury.  ECF

No. 92 at 62.  According to Mr. Saad, he never should have gone to trial, *id.* at 62, 64, and Counsel's advice to reject the Government's plea offer was objectively unreasonable, *id.* at 64.

The Court has already addressed Mr. Saad's allegations regarding conducting reasonable investigations, interviewing witnesses, and properly advising him regarding testimony.  Therefore, for purposes of addressing Mr. Saad's plea offer contention, the Court assumes that Counsel did not provide ineffective assistance in these areas.

As noted above, the performance standard for demonstrating ineffective assistance of counsel in the plea context is the same as *Strickland*'s: that counsel's performance fell below an objective standard of reasonableness.  *Lafler*, 566 U.S. at 163 (quoting *Hill v. Lockhart*, 474 U.S. at 57).  In terms of prejudice, a defendant must show that:

> [B]ut for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 164.  Mr. Saad fails to meet the standard.

Counsel states in his Affidavit:

> As an experienced criminal defense attorney, it is both my duty and my practice to provide my client with information concerning the benefits of a plea as well as the strengths and weaknesses of his case, which I did with Saad.  Ultimately, however, under Rhode Island Rule of

28

> Professional Conduct 1.2(a), it is the client's decision whether to accept
> or reject the plea offer.

ECF No. 98-1 at 11 ¶21.  In this case, Counsel affirms that he informed Mr. Saad that

the Government had extended an offer for Mr. Saad to plead guilty to one count of

wire fraud, which carries a mandatory minimum sentence of five years incarceration;

that he discussed the Government's plea offer with Mr. Saad on several occasions,

including an offer made pre-indictment; and that he never advised Mr. Saad to reject

the Government's offer.  *Id.* ¶ 22.  Counsel continues:

> Based on my previous conversations with Saad, I knew he did not want
> to accept the plea offer the government had proposed.  Shortly before the
> Court scheduled a *Frye*[10] hearing, I sent Saad an email notifying him
> once more of the government's offer, and explaining to him that the
> Court intended to conduct a hearing in order to confirm that Saad was
> aware of the Government's offer and had decided to reject it.  Saad
> emailed me the following response: "You know my answer."  Based on
> my discussions with Saad, I knew his email response meant that he
> intended to inform the Court at the *Frye* hearing that he wanted to
> reject the government's offer and proceed to trial.  At the *Frye* hearing
> held on January 5, 2017, that is exactly what happened.

*Id.* at 11-12 ¶ 23 (internal citations omitted).

The transcript of the January 5, 2017, hearing, supports Counsel's account and

undermines Mr. Saad's claim.  The Court began the hearing by asking if the

Government had made a plea offer to Mr. Saad.  ECF No. 92-1 at 133.

> MR. FERLAND:    Yes, your Honor.  The plea negotiations in this
> case have been ongoing.  In fact, we initiated plea discussions prior to
> the issuance of the indictment.  Our last and final offer to counsel was a
> plea to one count of wire fraud at which point the government would
> recommend a sentence of five years.  And we would request that the plea
> be a binding plea.  It's my understanding that that offer was conveyed

---

[10] *Missouri v. Frye*, 566 U.S. 134 (2012).

to counsel - - I'm sorry, by counsel to the defendant and has been rejected.

THE COURT:   Mr. Ferland, what is the government's calculation of the Guideline range on all of the counts that will currently be before the jury on Monday?

MR. FERLAND:   The defendant is facing a minimum mandatory of 15 years.   The fire in use of the commission of a federal felony is a ten-year minimum mandatory that must run consecutive to the underlying felony, which in this case is the wire fraud.   And the arson is a minimum mandatory of five.   The First Circuit has said that those sentences run consecutive to one another.   His exposure is a minimum of 15 years.

THE COURT:        Thank you, Mr. Ferland.

[Counsel], have you explained the plea offer - - the final plea offer - - from the government to Mr. Saad?

[COUNSEL]:        I have, your Honor.   I discussed it verbally and in writing with Mr. Saad.

THE COURT:        Mr. Saad, is that in fact correct?   Have you discussed the plea offer from the government with your attorney?

THE DEFENDANT:  Yes, he has.

THE COURT:        Okay.   And has he fully explained the implications of the plea and the implications of going forward in trial to you?

THE DEFENDANT:  Yes, he has.

THE COURT:        To your satisfaction?

THE DEFENDANT:  Yes.

THE COURT:        Okay.   And you've rejected and continue today to reject the plea offer from the government?

THE DEFENDANT:  Yes, I do.

30

*Id.* It bears repeating that, when asked if Counsel had discussed the plea offer with him to his satisfaction, Mr. Saad responded affirmatively. *See id.*

Post-hearing, Counsel again spoke with Mr. Saad regarding the Government's offer:

> After the *Frye* hearing, Saad and I had a telephone conversation during which I once again sought to confirm his intention to reject the government's offer and proceed to trial. During that conversation, Saad told me that, "It's all or nothing, Bill." [My associate] was present with me during this conversation and was able to hear Saad's end of the conversation as well as mine.
>
> Based on my conversation and correspondence with Saad, I was confident at the time of trial that Saad understood the potential risks associated with rejecting the government's plea offer and proceeding to trial.

ECF No. 98-1 at 12 ¶¶ 24-25.

It appears both from Counsel's Affidavit and from Mr. Saad's own statements to the Court during the *Frye* hearing that Counsel fulfilled his obligation to present and explain the Government's plea offer to Mr. Saad and that Mr. Saad was determined to go to trial. According to Mr. Saad, "[a]lthough the record of the Frye hearing speaks to the Petitioner's knowledge of the five year binding plea offer, it offers absolutely no insight into the advi[c]e counsel rendered to actually reject it." ECF No. 92 at 63. However, Mr. Saad has provided no details as to what advice Counsel actually rendered, other than to assert that Mr. Saad could explain away his lies regarding his location at the time of the fire. *See id.* at 64; *see also McGill*, 11 F.3d at 225. According to Mr. Saad, "had the overwhelming nature and caliber of the <u>circumstantial</u> case against him been properly and thoroughly explained to him by

31

counsel," *id.*, he would have pled guilty, *id.*  In light of Counsel's denial that he advised Mr. Saad to reject the plea offer—which Mr. Saad has not countered, for example, with an affidavit of his own or some other evidence—the Court cannot find that Counsel's performance was ineffective.

Although the Court need not address the prejudice prong, *see Sleeper*, 510 F.3d at 39, it is clear that Mr. Saad cannot demonstrate prejudice.  Specifically, he cannot show that, but for Counsel's advice, he would have accepted the plea offer.  *Lafler*, 566 U.S. at 164.  Given his statement to the Court during the *Frye* hearing as well as his statements to Counsel both before and after the *Frye* hearing, it is clear that Mr. Saad's choice was to go to trial.  ECF No. 92-1 at 133 (affirming that he continued to reject the offer, on the eve of trial and after hearing his sentencing exposure); ECF No. 98-1 at 12 ¶ 23 (responding "[y]ou know my answer" when informed about the upcoming *Frye* hearing), ¶ 24 (informing Counsel that "[i]t's all or nothing" when asked again about pleading after the *Frye* hearing).

In addition, Mr. Saad argues that his "Sixth Amendment right to counsel during the plea bargaining process was also violated were [sic], given the totality of the circumstantial case against him, Counsel failed to pursue the viability of an *Alford* Plea."  ECF No. 92 at 64.  With respect to this issue, Counsel states: "I never discussed a so-called *Alford* plea with Saad because, as a criminal defense attorney with extensive experience in the local federal court, I am aware that judges of the United States District Court for the District of Rhode Island will not accept an *Alford* plea."  ECF No. 98-1 at 11 ¶ 22.  Based on his experience in and knowledge of this

32

Court, Counsel determined that an *Alford* plea was not a viable alternative. "Counsel cannot be deemed ineffective for failing to pursue futile arguments." *Dure*, 127 F. Supp. 2d at 280; *see also United States v. Cabrera*, 215 F.3d 1312, 2000 WL 227937, at *1 (1st Cir. 2000) (unpublished table decision) (text available in Westlaw) (quoting *Vieux*, 184 F.3d at 64 ("Obviously, counsel's performance was not deficient if he declined to pursue a futile tactic.")).

In sum, in no instance has Mr. Saad demonstrated that Counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The Court finds all his allegations that he received ineffective assistance of counsel to lack merit.

C.  Law Enforcement Misconduct

Lastly, Mr. Saad claims that his Fourth, Fifth, and Sixth Amendment rights were violated when investigators: (1) used materially false statements to obtain a search warrant; (2) omitted material information from a search warrant application; (3) seized the pellet stove without a warrant, then committed perjury by testifying that a warrant was sought and obtained to seize the pellet stove; and (4) withheld the narrative of Officer Sousa from the defense. ECF No. 92 at 64-65. The Court addresses Mr. Saad's allegations of law enforcement misconduct together as they all contain the same defect: they are wholly unsupported and unsubstantiated.[11]

---

[11]   The Government's description of Ground Seven is apt: "Ground Seven appears to be a legal grab bag into which Saad thrusts all of the constitutional claims that he portrays earlier in his petition as ineffective assistance of counsel claims." ECF No. 98 at 20.

For example, in his section entitled "Supporting Facts," Mr. Saad simply repeats the allegations contained in Ground Seven. *Id.* at 65. The one addition is the date of the search warrant in question, December 4, 2014. *Id.* Thus, as before, Mr. Saad is relying on mere "conclusory allegations" and/or "self-interested characterizations . . . ." *McGill*, 11 F.3d at 225. Moreover, to the extent that Mr. Saad refers to "all of the reasons stated above," ECF No. 92 at 65, presumably referring to the entire Motion, such reference hardly constitutes developed argumentation, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (noting "settled appellate rule" that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *see also Barreto-Barreto*, 551 F.3d at 99-100 (deeming petitioners' argument waived and declining to address it on merits because petitioners failed to develop argument beyond assertion). Moreover, the Court has already addressed "the reasons stated above[.]" ECF No. 92 at 65. Further, to the extent Mr. Saad failed to raise these issues on direct appeal, he has not attempted to show cause for his failure to do so, *see Bousley*, 523 U.S. at 622, and the Court has already rejected his actual innocence claim. Mr. Saad's final ground or relief is, therefore, rejected.

## CONCLUSION

Mr. Saad's Motion lacks merit. The Court therefore DENIES Daniel Saad's Motion to Vacate his conviction (ECF No. 92) under 28 U.S.C. § 2255.

## RULING ON CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing § 2255 Proceedings in the United States District Courts ("§ 2255 Rules"), this Court finds that this case is <u>not</u> appropriate for issuing a certificate of appealability, because Mr. Saad has failed to make a substantial showing of the denial of a constitutional right on any claim, as required by 28 U.S.C. § 2253(c)(2).

Mr. Saad is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal here. *See* § 2255 Rule 11(a).

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief United States District Judge

Date:    January 12, 2021